**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| World Health Alternatives, | ) | Case No. 06-10166(PJW) |
| Inc., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MEMORANDUM OPINION

Stephen M. Miller
Carl N. Kunz, III
Rafael X. Zahralddin
Morris, James, Hitchens &
Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899-2306

Sarah Robinson Borders
Felton E. Parrish
Seema N. Patel
King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303-1763

Attorneys for Debtors

Kelly Beaudin Stapleton
United States Trustee
Joseph J. McMahon, Jr.
Trial Attorney
United States Department of
Justice
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox 35
Wilmington, Delaware 19801

Pauline K. Morgan
M. Blake Cleary
Erin Edwards
Young Conaway Stargatt &
Taylor, LLP
The Brandywine Building
1000 West Street
17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391

Counsel to the Official
Committee of Unsecured
Creditors

Kenneth J. Ottaviano
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693

Counsel for CapitalSource
Finance, LLC

Date: July 7, 2006

**WALSH, J.**

This opinion is with respect to the Debtors' motion (Doc. # 310) for entry of an order approving a settlement agreement among the Official Committee of Unsecured Creditors (the "Committee"), the Debtors, and CapitalSource Finance, LLC. ("CapSource"). The United States Trustee ("UST") opposes the motion. For the reasons discussed below, the Court will grant the motion.

**BACKGROUND**

On February 20, 2006, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (the "Bankruptcy Code") (Doc. #1). That day, the Debtors also filed a series of motions including (1) a motion to schedule an auction for the sale of substantially all of the Debtors' assets and approving of the bid procedures governing the proposed sale (Doc # 22), (2) a motion approving the sale of substantially all of the Debtors' assets (Doc. # 23) and (3) a motion granting the authority to incur post-petition secured and super-priority indebtedness (Doc. # 9). The proposed DIP financing lender was CapSource, the pre-petition lender with a first lien on all of the Debtors' assets.

On March 6, 2006, the UST appointed the Committee pursuant to Bankruptcy Code § 1102(a)(1). On March 10, 2006, the Committee filed objections to the bid procedures and the DIP financing motion. Negotiations followed, and on March 17, 2006,

the Court granted a final order authorizing the DIP financing motion and the proposed bid procedures.

The final DIP financing order (the "DIP Financing Order") is rather conventional in its terms.  With respect to the matter before me, two terms are of particular significance.  First, the Debtors acknowledged and agreed "that the Pre-Petition Debt is (i) legal, valid, binding and enforceable against each Debtor; and (ii) not subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law or otherwise." (Doc. # 168, ¶ F).  Paragraph 23(b) of the DIP Financing Order again recites that the Debtors have waived and shall be barred from any challenge to CapSource's claim (Doc. # 168, ¶ 23(b)).  The Debtors' positions are binding on their successors and assigns, including any bankruptcy trustees. (Doc. # 168, ¶ 24).  Second, Paragraph 23(b) contains the following proviso regarding the right of others to challenge CapSource's position:

> Notwithstanding the foregoing, any party-in-interest (other than Debtors) with the requisite standing to do so, and the Committee shall be permitted to investigate . . . and challenge, in accordance with the Bankruptcy Rules, the validity, enforceability, priority, perfection or amount of the Pre-Petition Debt or Pre-Petition Lender's liens on the Pre-Petition Lender Collateral in respect thereof, or otherwise asserting any claims or causes of action against Pre-Petition Lender or on behalf of Debtor's estates, which shall be

> filed no later than the earlier of (x)
> seventy-five (75) calendar days after the
> Petition Date, (y) two (2) calendar days prior
> to the Auction or (z) two (2) business days
> prior to the Sale Hearing.

(Doc. # 168, ¶ 23(b)(footnotes omitted).  Pursuant to this provision, as of April 16, 2006 the time period for any challenges to CapSource's position expired as to all parties in interest other than the Committee and prior to that date, no such parties had filed any challenge.  The Committee obtained from CapSource an extension of the time period to April 19, 2006 and, as described below, a further extension was agreed to.

Pursuant to the bid procedures order, an auction was scheduled for April 18, 2006.  But no one other than the pre-petition stalking horse bidder submitted a bid—which bid was for a purchase price of $43,000,000.  A hearing on the Debtors' motion to approve the sale to the stalking horse bidder was scheduled for April 20, 2006.  The Committee reserved its right to object to the sale motion, and for several days prior to the April 20, 2006 hearing date, the Committee negotiated extensively with CapSource and the Debtors regarding the Committee's objection.  As a result, on April 19, 2006, the Debtors, the Committee, and CapSource entered into a letter agreement (the "Letter Agreement"), which provided for a global settlement of disputes among the parties (Doc. # 310, ex. A).

At the sale hearing on April 20, 2006, counsel for the Committee advised the Court that, as a result of extensive negotiations, the parties had reached a settlement, whereby the Committee agreed to withdraw its objection to the sale motion. Counsel for the Committee represented to the Court that the withdrawal was made in consideration for certain concessions made by CapSource as set forth in the Letter Agreement. Committee counsel handed up to the Court a copy of the Letter Agreement, briefly outlined the terms of that agreement and advised that Court approval of the Letter Agreement would be sought at a later hearing. A Bankruptcy Rule 9019 motion to approve the Letter Agreement was filed by the Debtors the next day and was served on all creditors. A hearing on the motion was scheduled for May 11, 2006. While that motion was pending, the Court, on April 25, 2006, entered an order approving the sale motion (Doc. # 315), and on April 28, 2006, the sale transaction closed. The hearing on the Rule 9019 motion was held on May 11, 2006 and June 12, 2006.

The principal terms of the Letter Agreement are as follows (with some significant portions quoted verbatim):

(1) Committee objections: "The Committee has raised formal and informal objections with respect to (a) the Sale Motion, (b) the extent and validity of certain of the CapitalSource Liens, (c) the amount of certain of the CapitalSource Claims, and (d) has asserted

6

possible Causes of Action against CapitalSource (collectively, the "Objections")." (Doc. # 310, ex. A, p.2).

(2) CapSource's claim cap: CapSource agreed to cap its secured claim at $42,500,000 (an amount less than its asserted claim), and it waived any deficiency claim. (Doc. # 310, ex. A, ¶ 2).

(3) Committee right to challenge preserved: The challenge period in Paragraph 23 of the DIP Financing Order was stayed so that the Committee's right to challenge CapSource is preserved until the Court enters a final and nonappealable order approving the Letter Agreement, provided that if the Court denies approval of the Letter Agreement, then pursuant to Paragraph 23, the Committee has an additional five days to challenge CapSource's position. (Doc. # 310, ex. A, ¶ 3).

(4) Collateral Carve-Out ($1,625,000):

> Within two (2) business days after an order approving this Letter Agreement becomes final and non-appealable, CapitalSource shall grant and pay to and for the exclusive benefit of the Debtors' general unsecured creditors a collateral carveout from its lien in the amount of $1,625,000.00 (the "Collateral Carve-Out") to be (a) distributed to the holders of allowed general unsecured claims after payment of any unpaid professional fees and expenses of the Committee and/or (b) used to investigate and prosecute estate causes of action against parties other than CapitalSource. The Collateral Carve-Out shall be wired into an escrow account for counsel to the Committee. The Debtors and the Committee acknowledge and agree that the Collateral Carve-Out will be available to be: (i) distributed to the holders of allowed general unsecured claims after payment of any unpaid

> professional fees and expenses of the
> Committee and/or (ii) used to investigate and
> prosecute estate causes of action against
> parties other than CapitalSource.

(Doc. # 310, ex. A, ¶ 4).

(5) Objections withdrawn and release of claims: The Committee agreed not to pursue its Objections, agreed to support the sale motion, and agreed that "the Debtors and the Committee on behalf of themselves and the Debtors' estates . . . shall be deemed to have released, acquitted and forever discharged CapitalSource . . . from any and all claims and causes of action that the Debtors, the Committee, or the Debtors' estates may have or claim to have against" CapSource.[1] (Doc. # 310, ex. A, ¶ 5).

(6) Committee pursuit of causes of action: Upon final approval of the Letter Agreement, "the Committee is granted the right to pursue claims, causes of action and recoveries (a) under sections 502(d), 544, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, or any other avoidance actions under 11 U.S.C. §§ 101-1330 et seq. (the "Avoidance Actions"); and (b) relating to (i) the D&O Claims, (ii) the Former Auditor Claims, and (iii) the Former Counsel Claims." (Doc. # 310, ex. A, ¶ 6).  The latter three defined terms refer to the Debtors' officers, directors and pre-petition

---

[1]The Debtors' release is somewhat puzzling in light of the fact that pursuant to the DIP Financing Order the Debtors had already granted a release to CapSource.

8

professionals.[2]  CapSource waived any right to pursue causes of
action against these persons.  (Doc. # 310, ex. A, ¶ 5).

     The UST filed an objection to the settlement motion,
arguing that a recent Third Circuit opinion, In re Armstrong World
Indus., Inc., 432 F.3d 507 (3d Cir. 2005), prohibits this Court
from approving a settlement that pays anything to the general
unsecured creditors before priority tax creditors are paid.  The
Debtors' schedules list a number of tax creditors entitled to
priority under Bankruptcy Code § 507.  The amounts of these claims
are listed as "unknown," but there was testimony to the effect that
the IRS asserts a tax claim in excess of $4,000,000.  None of these
priority creditors, nor any other party in interest other than the
UST, objects to the settlement.

     After the Debtors filed their motion to approve the
Letter Agreement, the UST filed a motion to appoint a chapter 11
trustee or, alternatively, to convert the cases to chapter 7.
Subsequently, the Debtors filed a motion to convert the cases to
chapter 7.  At the June 12, 2006 hearing on the motion to approve
the Letter Agreement, the Debtors, the Committee and the UST
supported a conversion to chapter 7, with the Debtors and the
Committee requesting a ruling on the Letter Agreement prior to a
conversion.  No party in interest opposes the conversion to chapter

_____

     [2]In this regard, the Committee states that there is a
$5,000,000 D & O insurance policy.  (Doc. # 402, p.18)

7, and following this ruling on the Letter Agreement, a conversion order seems inevitable. Of course, upon conversion of the cases to chapter 7, the Committee will cease to exist. Official Comm. of Unsecured Creditors v. Belgravia Paper Co.(In re Great Northern Paper, Inc.), 299 B.R. 1, 6-7 (D. Me. 2003); see also In re Parks Jaggers Aerospace Co., 129 B.R. 265, 268 (M.D. Fla. 1991); In re Freedlander, Inc. The Mortgage People, 103 B.R. 752, 758 (Bankr. E.D. Va. 1989)(same).

## DISCUSSION

A bankruptcy court has the authority to "approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Settlements are generally favored in bankruptcy. Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996). They minimize litigation and expedite the administration of the estate. Id.

Whether to approve a settlement, however, is within the discretion of the bankruptcy court. In re Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005). The court, when exercising this discretion, must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Martin, 91 F.3d at 393. In striking this balance, the court must examine four factors:

> (1) the probability of success in litigation;
> (2) the likely difficulties in collection; (3)
> the complexity of the litigation involved, and
> the expense, inconvenience and delay

> necessarily attending it; and (4) the
> paramount interest of the creditors.

Id. ("taking [its] cue" from Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414 (1968)).

In the final analysis, "the court does not have to be convinced that the settlement is the best possible compromise." In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) (citing Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994)). Rather, the court must conclude that the settlement is "within the reasonable range of litigation possibilities." In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); see In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983)(stating that the responsibility of the bankruptcy judge is "not to decide the numerous questions of law and fact raised" by the objections, "but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." (internal quotations and alteration omitted)).

In this case, the settlement represents global peace among the Debtors, the Committee, and CapSource. As noted above, pursuant to the DIP Financing Order, the Committee and any other party in interest (but not the Debtors) could bring causes of action against CapSource during the specified period of time (Doc. # 168, ¶ 23). That period of time expired on April 16, 2006, two calendar days before the auction date (Doc. # 168, ¶ 23). Before

the time period expired, the Committee sought and received an
extension from CapSource (Doc. # 310, ex. A, p.2). As a result,
at the time the parties executed the Letter Agreement, only the
Committee had preserved its right to bring any cause of action
against CapSource.

      As detailed above, the Letter Agreement effected the
following: (1) the Committee, in conjunction with the Debtors,
released the estate's causes of action against CapSource (Doc. #
310, ex. A, ¶ 5), and the Committee withdrew its Objections, (2)
CapSource promised to limit its secured claim against the estate to
$42,500,000 and to waive its right to any deficiency claim (Doc. #
310, ex. A, ¶ 2), (3) CapSource agreed to pay a $1,625,000
collateral carve out for the benefit of general unsecured creditors
(Doc. # 310, ex. A, ¶ 4), (4) these funds can be either directly
distributed to the general unsecured creditors and/or used to
pursue causes of action against parties other than CapSource,
including the Debtors' officers, directors, lawyers and accountants
(Doc. # 310, ex. A, ¶ 4). To the extent the $1,625,000 is used to
pursue those causes of action and any of them are successful, the
recoveries will be to the benefit of the estate since they are
estate causes of action (Doc. # 310, ex. A, ¶ 4). On the other
hand, to the extent the carve out funds are distributed to the

general unsecured creditors, then the estate is not directly
benefitted.[3]

The UST objects to the settlement on two grounds. First,
the UST argues that the settlement violates the law (Doc. # 340,
p.1 (citing In re Armstrong World Indus., Inc., 432 F.3d 507)).
Second, the UST argues that the settlement reflects a result that
the Committee could not achieve had it successfully litigated the
causes of action against CapSource  (Doc. # 340, p.2).  This is
really one objection, and the UST acknowledges as much in its
papers: "[a]t bottom, the principle motivating the UST's two
objections is the same—the [Committee] is not authorized to borrow
and/or compromise estate claims and causes of action at the expense
of priority creditors in chapter 11." (Doc. # 340, p.2).

Although the general unsecured creditors will receive
money before the priority creditors, that money does not belong to
the estate—it belongs to CapSource.  See Official Comm. Of
Unsecured Creditors v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305,
1313 (1st Cir. 1993). In other words, the payout to the general
unsecured creditors is a carve out of the secured creditor's lien

---

[3]Over the course of the last five years or so, I have seen a
number of liquidating chapter 11 cases in this Court where the
official committee of unsecured creditors entered into this type of
carve out settlement with the first lien lender for the benefit of
general unsecured creditors.  Similar to the instant situation,
those cases involved asset sales with little or no prospects for
any recovery therefrom for general unsecured creditors.

and not estate property.  I believe the Bankruptcy Code does not prohibit this arrangement and reported cases so hold.  Id. at 1313.

Despite this, the UST argues that the Third Circuit's decision in In re Armstrong World Indus., Inc. prohibits such an agreement (Doc. 397, p.2).  I disagree.  Armstrong distinguished, but did not disapprove of, a line of authority that approved this type of agreement.  Armstrong, 432 F.3d at 514 (discussing In re SPM, 984 F.2d 1305, In re MCorp Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993), and In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del 2001)).

Armstrong also explained that the above line of authority did "not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive."  Armstrong, 432 F.3d at 514.  Rather, "[c]reditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B)."  Id.  Section 1129(b)(2)(B) provides:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
>                     ***
>
> (B) With respect to a class of unsecured claims--
>
> > (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or
> interest that is junior to the
> claims of such class will not
> receive or retain <u>under the plan</u> on
> account of such junior claim or
> interest any property, except that
> in a case in which the debtor is an
> individual, the debtor may retain
> property included in the estate
> under section 1115 subject to the
> requirements of subsection (a)(14)
> of this section.

11 U.S.C. § 1129(b)(2)(B)(emphasis added).  Section 1129(b)(2)(B)

and the absolute priority rule, however, are not implicated here

because the settlement does not arise in the context of a plan of

reorganization.  Indeed, the UST does not argue that <u>Armstrong</u>

actually supplies the result to this case, but rather asserts that

the ideas or general principles discussed in <u>Armstrong</u> suggest that

such an agreement is improper (Doc. # 340, pp.1, 6).   The Court

disagrees.

    <u>Armstrong</u> dealt with a plan of reorganization, thus

implicating the absolute priority rule of Bankruptcy Code §

1129(b)(2)(B).  Under the plan at issue in <u>Armstrong</u>, "an unsecured

creditor class would receive and automatically transfer warrants to

the holder of equity interests in the event that its co-equal class

rejects the reorganization plan." <u>Armstrong</u>, 432 F.3d at 514.  The

Third Circuit concluded that the absolute priority rule applied and

was violated by such a distribution scheme.  <u>Id.</u>

In coming to that result, <u>Armstrong</u> expressly distinguished the <u>SPM</u>, <u>MCorp</u>, and <u>Genesis</u> cases. These cases allowed a senior creditor to agree to give up part of its collateral to another class, skipping other classes in between. <u>Id.</u> <u>Armstrong</u>'s grounds for distinguishing such cases are important. For example, <u>Armstrong</u> distinguished <u>SPM</u> on three grounds:

> (1) SPM involved a distribution under Chapter 7, which did not trigger 11 U.S.C. § 1129(b)(2)(B)(ii); (2) the senior creditor had a perfected security interest, meaning that the property was not subject to distribution under the Bankruptcy Code's priority scheme; and (3) the distribution was a "carve out," a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others.

<u>Armstrong</u>, 432 F.3d at 514. Each of these grounds is relevant to the matter here.

First, <u>SPM</u> involved a settlement agreement in a chapter 7 context, which did not trigger the absolute priority rule. <u>Id.</u> Like <u>SPM</u>, the instant dispute also arises in the context of a settlement agreement—not a plan. Further, this case is moving toward conversion and an order to that effect will be entered shortly. There are no prospects for a plan of reorganization here.

Second, <u>SPM</u> involved a secured creditor's perfected security interest. The Third Circuit recognized that this meant

"that the property was not subject to distribution under the Bankruptcy Code's priority scheme." Armstrong, 432 F.3d at 514 (adopting the District Court's reasoning). This is the case here as well.

Third, SPM, unlike Armstrong, involved a "'carve out,' a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others." Id. This again is the exact situation here. Thus, the three grounds on which the Third Circuit distinguished SPM also distinguish the case here from Armstrong.[4]

Seemingly, even if the absolute priority rule applied, which it does not, an ordinary carve out such as here would not offend the rule. This follows from Armstrong's discussion of the Genesis and MCorp cases. Both cases involved plans of reorganization, thereby implicating the absolute priority rule. See id. This also follows from the Armstrong District Court's reasoning, which the Third Circuit adopted.

The Third Circuit in Armstrong characterized the Genesis court as allowing a secured creditor to "(1) give up a portion of their proceeds under the reorganization plan to holders of

_____

[4]Interestingly, the SPM case also involved an IRS priority tax claim issue, except that the objection to the settlement was filed by former officers of the debtor who were exposed to personal liability for whatever portion of the tax claim was not paid by the estate.

unsecured and subordinated claims, without including holders of punitive damages claims in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package." Id. Armstrong then distinguished this arrangement as an ordinary carve out of the senior creditors' liens for the junior claimants' benefit. Id. Such a carve out does not offend the absolute priority rule or the Bankruptcy Code's distribution scheme because the property belongs to the secured creditor—not the estate. See id. Likewise, the Armstrong District Court, whose reasoning the Third Circuit adopted, also acknowledged the propriety of an ordinary carve out and the correctness of SPM: "the secured lender in SPM had a substantive right to dispose of its property, including the right to share the proceeds subject to its lien with other classes." In re Armstrong World Indus., Inc., 320 B.R. 523, 534 (D.Del. 2005) aff'd 432 F.3d 507 (3d Cir. 2005). Thus, Armstrong distinguished, but did not disapprove of, SPM and the Genesis-MCorp line of authority. That line of authority holds that agreements, like the one at issue here, are valid carve outs that allow the secured creditor to give up a portion of its lien for the benefit of junior creditors without violating the provisions of the Bankruptcy Code. See In re SPM, 984 F.2d at 1313; In re MCorp, 160 B.R. at 960; In re Genesis, 266 B.R. at 602.

The UST asserts that this Court should reach a different result than <u>SPM</u> and its progeny because <u>SPM</u> did not involve a party releasing claims on behalf of the estate (Doc. # 397, p.15).  The UST makes this argument on the basis of a copy of the settlement agreement in <u>SPM</u>, which she obtained from a party to the <u>SPM</u> case (Doc. # 397, p.15).  Pursuant to that settlement agreement, the secured bank lender and the creditors committee undertook joint efforts to maximize recovery, with the bank sharing a small portion of its recovery with the committee.  I am not persuaded that this distinction is meaningful.  Furthermore, the Court does not have before it the record made in the <u>SPM</u> case regarding that settlement, including any ancillary matters or events.  That document alone presents an insufficient record upon which to weigh the UST's distinction.

The UST focuses on the Letter Agreement's release of causes of action against CapSource which, if pursued and succeeded in recoveries, those recoveries would be for the benefit of the estate and distributed first to priority creditors prior to any possible distribution to the general unsecured creditors.  However, it is important to note that giving up estate causes of action against CapSource is not the only consideration that CapSource receives under the Letter Agreement.  The Committee gave up <u>its</u> right to pursue its objection to the sale motion.  This right belonged exclusively to the Committee.  When this case was filed,

it clearly was a liquidating case, and indeed, the Debtors had already signed up a stalking horse bidder for the purchase of the going concern business.  With respect to the concept of a quick sale, the facts surrounding the marketing effort and timing of the sale, the Committee vigorously opposed the Debtors and CapSource from the outset of its appointment.  The only substantive objections to the auction procedures motion and the sale motion were those raised by the Committee.  The Letter Agreement allowed the sale motion to go forward, and of course, the sale closed at the end of April 2006.  Obviously, if the Debtors lost the sale motion or if there were a serious delay to the approval of that motion, the value of CapSource's collateral could have been seriously jeopardized.  Thus, the $1,625,000 carve out payment is not only in exchange for the release of estate causes of action against CapSource, but for the removal of the only serious challenge (by the Committee) to the Debtors' and CapSource's joint goal at the outset of the case to effect a quick sale that would likely provide little, if any, benefit to any party other than CapSource.

As stated in its supplemental memorandum (Doc. # 402, p.10), the Committee's challenges included the following:

> The Committee challenged, among other things,[7] the integrity of the sale process, the length and adequacy of the Debtors' marketing efforts, the actions and statements by insiders who stood to benefit

from an ownership interest in the
purchaser if the stalking horse bid
was approved, the influence exerted
by, and fees paid to, CapSource in
the months leading up to the
Petition Date, the calculation of
CapSource's claim, and the propriety
of permitting the sale proceeds to
be paid to CapSource at closing.

In a footnote to that statement, the Committee comments as follows:

One arrow that the Committee did <u>not</u>
have in its quiver was a credible
threat to challenge the validity and
perfection of CapSource's liens,
since it could discern no infirmity
in those liens. <u>See</u> Tr. at 22:18-
20. Thus, as in <u>SPM</u>, the lender had
a first priority secured claim in
the proceeds of its collateral.

I find the first of these two statements to reflect the
record fairly in this case, and neither statement is seriously
challenged by the UST. Thus, I conclude that the Committee's
withdrawal of its objection to the sale motion constitutes
substantial consideration given by the Committee, not on behalf of
the estate or the Debtors, in exchange for the Collateral Carve-
Out.[4]  Given the fact that this consideration running from the

_____

[4]In its opposition brief, the UST points out that at the May
11, 2006 hearing I stated that I did not think that the Committee's
objection to the sale motion would have been successful.  That
comment was made on the basis of my experience with liquidating
chapter 11 cases, and the Committee had not, and has not, set forth
before the Court the bases for its opposition or the evidence
intended to be offered in support of the opposition absent the
settlement.  Nor am I aware of CapSource's assessment of the
Committee's bases for opposition which prompted CapSource to settle

Committee to CapSource has already occurred and cannot be undone, to deny approval of the Letter Agreement at this time would give only CapSource the benefit of this part of the settlement. And, of course, non-approval would enable CapSource to keep the $1,625,000.

Denial of approval of the Letter Agreement could have an additional negative impact on the estate. The estate has $1,347,000 remaining from the sale proceeds, after administrative expenses have been paid or otherwise provided for (Doc. # 474). If the Letter Agreement is not approved, then CapSource could seek to recover the full amount of its secured claim against the sale proceeds. This, in turn, could reduce the $1,347,000 remaining in the estate that may be used by the chapter 7 trustee to pursue estate causes of action against Debtors' officers, directors, and professionals. On the record before me, it is not possible to quantify the difference between CapSource's capped claim ($42,500,000) and a potential allowed claim. CapSource believes that it could assert an additional claim of $1,850,196 with respect to the remaining sale proceeds (Doc. # 474). The Debtors contend that CapSource's claim against the Debtors has been fully satisfied by the amounts previously paid by the Debtors to CapSource (Doc. # 474). At this time, I can only conclude that, absent approval of the Letter Agreement, some or all of the $1,347,000 remaining in

---

the matter for a substantial carve out to the general unsecured creditors.

the estate may be subject to CapSource's secured claim and thus not available to benefit unsecured creditors. I note that the April 25, 2006 sale order recites that at the closing the payment of the sale proceeds to CapSource would not exceed $42,500,000, "with $325,000 of any balance of the cash proceeds to be held in escrow pending Court approval of the Letter Agreement." (Doc. # 315, ¶ 12). This $325,000 of escrowed funds is included in the $1,347,000 of estate funds remaining from the proceeds of the sale (Doc. # 475). If the Letter Agreement is not approved, I believe that, at a minimum, CapSource would arguably be entitled to that $325,000.

As noted above, the thrust of the UST's objection is that the Committee is unfairly compromising estate causes of action at the expense of priority creditors. That position raises the question as to the value of those causes of action. During the course of its settlement negotiations with CapSource, the Committee drafted a complaint against CapSource that sets forth multiple counts. The UST makes much of this draft document in support of her assertion that recoveries on these claims should inure to the benefit of the entire estate, including priority creditors. However, the testimony put on the record at the May 11, 2006 hearing regarding the potential for success on those claims was not encouraging.

The only testimony on this issue came from Mr. Gavin, the Committee's financial advisor, and Mr. Jones, the Debtors'

financial advisor (Doc. # 384, p.9 ll.14-15, p.26 ll.7-8). Both testified that the settlement was in the best interests of their clients. Their testimony is uncontradicted.

Mr. Gavin testified that the litigation would be very expensive, time consuming, and uncertain (Doc. # 384, p.11 ll.1-8). With respect to at least some of the claims, Mr. Gavin appeared to question whether there were even any recoverable damages (Doc. # 384, p.19 ll.9-14). As such, Mr. Gavin testified that "the Committee's guaranteed recovery and ability to pursue other actions on behalf of the estate in exchange for the Committee's cooperation and supporting the sale and the Committee's agreement not to sue CapitalSource was a fair compromise." (Doc. # 384, p.11 ll.9-14). In other words, "the letter agreement represent[ed] a fair, adequate, and reasonable settlement for the general unsecured creditors and the estate as a whole." (Doc. # 384, p.10 ll.8-11).

Mr. Jones agreed, explaining that "the debtor had undertaken its own review of possible causes of action against CapitalSource, and it determined that the likelihood of success on the merits of any such claims was very low." (Doc. # 384, p.26 ll.19-22). In addition, "any litigation against CapitalSource by the Committee would be time consuming, expensive." (Doc. # 384, p.27 ll.6-8). Further, "[i]t would not likely resolve in any significant recovery for the benefit of the estate." (Doc. # 384,

p.27 ll.8-9). Thus, Mr. Jones concluded that "the interests of the estate are clearly best served by compromising the asserted claims on the basis set forth in the letter agreement." (Doc. # 384, p.27 ll.21-23).

The Court agrees with Mr. Gavin and Mr. Jones, this agreement represents the best result and is fair, reasonable, adequate, and in the interest of the estate. The four <u>Martin</u> factors so demonstrate.

Factor one favors settlement because there is a low probability of litigation success. A sufficient degree of uncertainty exists as to whether the Committee, or a chapter 7 trustee, could prevail on any of the potential causes of action against CapSource. Moreover, the Court finds that the probability of successfully challenging CapSource's liens is low. As the Committee states, "[o]ne arrow that the Committee did <u>not</u> have in its quiver was a credible threat to challenge the validity, and perfection of CapSource's liens, since it could discern no infirmity in those liens." (Doc. # 402, p.10 n.7). The UST does not challenge this representation. Further, from the Court's experience, successful challenges to a pre-petition first lien creditor's position are unusual, if not rare. I attach little significance to the fact that the Committee counsel produced a draft multiple count complaint against CapSource. This may be viewed as litigation saber rattling.

Factor two is seemingly not relevant, and no party has addressed this point.

Factor three, however, weighs in favor of approving the proposed settlement.  The expense, inconvenience, and delay attendant to any litigation with CapSource could be great. Substantial expenditure of money may not be warranted in light of the low probability of success and the estate's limited resources.

Furthermore, the record in this case indicates a number of serious irregularities in the Debtors' pre-petition conduct of its financial affairs.  Counsel for the Committee observed that "this company has been the subject of pre-petition fraud and we do believe there are good causes of action against perhaps Debtor's directors and officers, prior auditors, [and] prior attorneys for the company . . . ." (Doc. # 349, pp.13-14 11.24-2).  The Letter Agreement potentially provides funds to finance the pursuit of such causes of action (Doc. # 310, ex. A, ¶ 6).  Equally important, the estate will have $1,347,000 available to finance such causes of action by the chapter 7 trustee.  Thus, the Court finds it is reasonable, when faced with limited funds, to forego expensive litigation against the pre-petition secured lender in favor of what appears to be more fruitful litigation against the Debtors' officers and directors and the professionals engaged by the Debtors.

Finally, factor four favors settlement.  The estate is better off because the settlement guarantees a substantial fund ($1,347,000) to pursue appropriate causes of action against others, which may produce recoveries distributable to all creditors.

At the June 12, 2006 hearing, I raised the question of whether the Committee had fiduciary obligations to the priority creditors.  The parties submitted supplemental filings on this question.

The Committee states in its brief that "as priority creditors are not intended to be constituent members of a creditors' committee because their pecuniary interests are fundamentally inimical to those of the general unsecured creditors, they are not a constituent group to whom the Committee owes a fiduciary duty."  (Doc. # 402, p.5).  The UST was more hesitant. She acknowledged that "[t]he case law uniformly indicates that the [Committee's] fiduciary duties run to the constituency it represents, and a number of courts have defined that constituency as being general unsecured creditors." (Doc. # 397, p.9).  Still, the UST concluded that the scope of the Committee's fiduciary duties was a collateral issue and should not affect the outcome in this dispute (Doc. # 397, p.9).

As such, both parties acknowledge that a number of cases support the proposition that the official committee of unsecured creditors owes its fiduciary duty only to the general unsecured

creditors (Doc. # 402, p.8 (citing <u>In re SPM</u>, 984 F.2d at 1316;

<u>Official Dalkon Shield Claimants' Comm. v. Mabey (In re A.H. Robins</u>

<u>Co.)</u>, 880 F.2d 769, 771 (4th Cir. 1989); <u>In re Int'l Swimming Pool</u>

<u>Corp.</u>, 186 F.Supp 63, 64 (S.D.N.Y. 1960); <u>Creditors' Comm. Of</u>

<u>Trantex Corp. v. Baybank Valley Trust Co. (In re Trantex Corp.)</u>, 10

B.R. 235, 238 (Bankr. D. Mass. 1981))). Presumably, the cases that

find that the creditors committee owes a fiduciary duty to the

general unsecured creditors only are recognizing the implicit

conflict of interest between general unsecured creditors and

priority creditors.

The UST has posed several interesting questions that the

Court need not presently decide:

> If the [Committee] is holding part of the
> 1.625 million (the "Settlement Funds") on the
> date of conversion, who will distribute the
> remaining monies?  Is a chapter 7 trustee
> authorized to distribute the Settlement Funds
> given that they are not property of the
> Debtors' estates?    Irrespective of the
> direction of the Debtors' cases, there are a
> number of troubling questions presented by the
> Settlement.  Presumably, to the extent that
> there are Settlement Funds remaining for
> distribution, the [Committee] intends to
> distribute such funds <u>pro rata</u> on account of
> allowed unsecured claims.  To the extent that
> there is a dispute regarding use of the
> Settlement Funds, does this Court have
> jurisdiction to resolve the dispute? Does an
> unsecured creditor's acceptance of Settlement
> Funds satisfy (in whole or in part) the
> liability of the Debtors' estates to the
> creditor?  What authority, if any, does the
> [Committee] have to establish rules governing
> use and distribution of the funds?

(Doc. # 340, p.7 n.3).  Some of these questions are misdirected because the Letter Agreement does not say that the Committee determines the distribution or use of the $1,625,000.  Nor does Committee counsel have an active role—counsel will only be an escrow agent.  The Letter Agreement does not say who will determine any cash distributions or use of the funds for litigation purposes. It only provides that the funds will be distributed to holders of allowed general unsecured claims and/or used to pursue causes of action against the Debtors' officers, directors, and professionals. The Letter Agreement recognizes these as "estate causes of action" (Doc. # 310, ex. A, ¶ 4), so that any recoveries will be for the benefit of the estate.  In any event, these questions lead to yet more questions.  For example, what effect will conversion of this case to chapter 7 have on the Letter Agreement implementation going forward? Upon conversion, the Committee will no longer exist.  The chapter 7 trustee will then have the right to pursue causes of action on behalf of the estate against the Debtors' officers, directors, and professionals.  As to one of the UST's questions, I note that the parties to the Letter Agreement intend for this Court to have exclusive jurisdiction for its implementation (Doc. # 310, ex. A, ¶ 12).

## CONCLUSION

For the reasons discussed above, the settlement is approved.  I believe that the record as a whole in this matter

suggests that, at the end of the day, only CapSource would be a winner if the Letter Agreement is not approved.  The Court acknowledges the UST raises valid logistical questions. Nevertheless, the Court finds that the settlement is in the best interest of the estate.